THE HONORABLE ROBERT J. BRYAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SCOTT R. PAULSON,

Plaintiff,

v.

PRINCIPAL LIFE INSURANCE
COMPANY,

Defendant.

No.: 3:16 cv 05268 RJB

PLAINTIFF'S MEMORANDUM IN
RESPONSE TO PRINCIPAL LIFE
INSURANCE COMPANY'S MOTION
FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD
PURSUANT TO RULE 52 OF THE
FEDERAL RULES OF CIVIL
PROCEDURE

Noted for Consideration: August 8, 2017

Oral Argument Requested

COMES NOW, PLAINTIFF, Scott R. Paulson, and submits his response to
Principal Life Insurance Company's Motion for Judgment on the Administrative Record
Pursuant to Rule 52 of the Federal Rules of Civil Procedure, herewith.

**1.      Trial on the Record**

Under an abuse of discretion standard of review, which Principal asserts is
proper in this case, the court's review is limited to the record before the plan
administrator. *Jebian v. Hewlett Packard Co. Emple. Benefits Org. Income Prot. Plan,* 349
F.3d 1098, 1110 (9th Cir. 2003); See *Meguerditchian v. Aetna Life Ins. Co.,* 648 F. App'x 605,

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL 503-206-4313
FAX 855-344-1726
www.roylawpdx.com

606 n.2 (9th Cir. 2016)("The district court did not abuse its discretion by refusing to consider documents outside the administrative record. '[I]n general, a district court may review only the administrative record when considering whether the plan administrator abused its discretion . . . .'"), quoting *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006) (en banc).

Under a de novo standard, the court has discretion to consider evidence not before the plan administrator, however, "a district court should not take additional evidence merely because someone at a later time comes up with new evidence that was not presented to the plan administrator." *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 944 (9th Cir. 1995). Rather,

> We . . . believe that the purposes of ERISA . . . warrant significant restraints on the district court's ability to allow evidence beyond what was presented to the administrator. In our view, the most desirable approach to the proper scope of *de novo* review under ERISA is one which balances the[] multiple purposes of ERISA. Consequently, we adopt a scope of review that permits the district court *in its discretion* to allow evidence that was not before the plan administrator. The district court should exercise its discretion, however, only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision. In most cases, where additional evidence is not necessary for adequate review of the benefits decision, the district court should only look at the evidence that was before the plan administrator . . . at the time of the determination.

*Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943 44 (9th Cir. 1995), quoting with approval, *Quesinberry v. Life Ins. Co.*, 987 F.2d 1017, 1025 (4th Cir. 1993); See also, *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006).

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL 503-206-4313
FAX 855-344-1726
www.roylawpdx.com

Thus, regardless of the standard of review, the evidence before the court is generally limited to the administrative record. *Mongeluzo*, supra. Principal, in its opening memo, is attempting to supplement the record. Principal terminated Paulson's benefits effective April 29, 2015. Dkt. # 24 at p. 2 (herein "Principal's Opening Memo"). Its final denial is dated March 3, 2016. Dkt. #21 at p. 225 232. The Administrative Record should have closed on or about March 3, 2016, when Principal made its final decision on the claim.

Notwithstanding this, Principal, in its argument, makes multiple references to information not in the record and which was not considered by Principal when it rendered its decisions:

A.  Paulson's home sales during the period July 2016 through June 2017 (Dkt. #24 at p. 3, 9 10, 12, 20, 24);

B.  May 2016 National Industry Specific Occupational Employment and Wage Estimates (Dkt. #24 at p. 3, 18 19, 23, 24); and

C.  Paulson's LinkedIn profile and reference to awards won in 2015 & 2016 (Dkt. #24 at p. 12).

The use of this "new" evidence amounts to sandbagging, as Paulson has no effective way to respond based on the record. See generally, *Mitchell v. CB Richard Ellis Long Term Disability Plan*, 611 F.3d 1192, 1199 n.2 (9th Cir. 2010); *Jebian v. Hewlett Packard Co., Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1104 (9th Cir. 2003). This "new" evidence further denies Paulson a meaningful dialogue with Principal, wherein Principal may explain its reasoning and Paulson may respond. *Booton v. Lockheed*, 110 F.3d 1461, 1463 (9th Cir. 1997).

If given the opportunity to engage in a meaningful dialogue, Paulson would have been able to explain to Principal, providing documentation as needed to refute the erroneous conclusions Principal has drawn from this evidence.

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL 503-206-4313
FAX 855-344-1726
www.roylawpdx.com

**A.      Post Appeal Denial Home Sales**

As to the homes sales Paulson has handled since Principal's final denial, while these sales might show Paulson's potential revenue, looking solely at revenue when discussing a self employed individual, is only looking at half the picture, as it does not consider expenses, and earnings are generally defined as "the balance of revenue after deduction of costs and expenses."[1] If Mr. Paulson's revenue was $100,000.00 for 2016, but his expenses were $85,000.00, then he only earned $20,000.00, which is well below the Primary Monthly Benefit. The operative phrase from the Policy is "Employment in which the Member could reasonably be expected to **earn** an amount equal to or greater than the Primary Monthly Benefit." Dkt. #21 at p. 2179.

Principal, through its past practices, has adopted, or at a minimum, acquiesced in, the interpretation of "earnings" as revenue less expenses (i.e. profit). Paulson was employed as a real estate agent prior to his benefits being terminated. During this period, Principal reduced his monthly benefits by his profits, not his revenue. Dkt. #21 at p. 2051 2054 ("Your policy allows you to earn up to 80% of your indexed predisability earnings during the benefit payment period and remain eligible for a residual benefit. However, if you exceed 80% of your indexed predisability earnings, there is no benefit payable and your claim will be closed.").

**B.      May 2016 Occupational Employment Statistics**

The May 2016 National Industry Specific Occupational Employment and Wage Estimates, which Principal cites to repeatedly, in an attempt to justify its assertion that the wages of real estate agents exceed the Primary Monthly Benefit, thus rendering the occupation "gainful," did not become available until March 2017.[2]

---

[1] https://www.merriam webster.com/dictionary/earnings (last visited July 10, 2017).

[2] (see https://www.bls.gov/oes/ ("The May 2016 Occupational Employment Statistics data were released on March 31st, 2017 and are available at www.bls.gov/oes/tables.htm" (last visited July 10, 2017); See also, generally,

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL  503-206-4313
FAX 855-344-1726
www.roylawpdx.com

Thus, neither Paulson, nor Principal could have relied upon the May 2016 numbers. The 2014 Occupational Employment and Wage Estimates report, the source cited to by Paulson's expert, which showed the median wage for real estate agents in the Tacoma area as $32,677 was the proper number to use and not an error as asserted in Principal's Opening Memo (Dkt. #24 at p. 24). Further, Paulson's expert's report contained an addendum, which used the 2015 figures, figures that were in keeping with the 2014 numbers she previously used. Finally, Paulson's expert used the median wage figures, which do not differ significantly from the median wage figures in the 2016 report Principal repeatedly cites to in its opening memo   2014   $19.35/hr; 2015 $18.19/hr; & 2016   $21.21/hr. Dkt. #21 at p. 217 323; Dkt. #24 at p. 9.

The smoking gun alleged by Principal does not exist. The reason for the differences in wages is that Paulson's expert used median wage data, which Principal also used at the outset, only switching to mean wage data when denying the final appeal, and now in litigation. See section 2, at page 6 of this memorandum for a more through discussion of the difference between mean and median wages, and why using mean wage data is not proper.

### C.     Paulson's LinkedIn Profile

Principal in its opening brief asserted that Paulson received an Emerald award in 2015 and 2016 from the Washington Multi Family Housing Association, based on Paulson's LinkedIn profile. Dkt. #24 at p. 12. However, Paulson's LinkedIn profile makes no such claim. What it says is simply "Emerald Award 2015/Emerald Award 2016." There is no reference to the Washington Multi Family Housing Association or any other granting body. Since Principal conducted enough research to discover that a

---

https://www.bls.gov/schedule/2015/home.htm,
https://www.bls.gov/oes/2014/may/oes419022.htm,
https://www.bls.gov/oes/2015/may/oes419022.htm (all last visited July 10, 2017).

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL 503-206-4313
FAX 855-344-1726
www.roylawpdx.com

local organization connected to the housing industry grants such an award, it is surprising that Principal did not review a list of award recipients readily available on the Washington Multi Family Housing Association's website to see that Paulson is not listed as an award recipient.[3]

This is a telling example of why "new" evidence should not be admitted, or garbage in garbage out.

If Principal had engaged in a meaningful dialogue with Paulson before coming up with new arguments to support its termination, it would have discovered that John L. Scott Real Estate, the firm for which Paulson works, gives awards to its agents, with "Emerald" being the lowest of five possible awards.[4]

**2. What is in a number?**

As previously noted, Principal repeatedly cites to the May 2016 National Industry Specific Occupational Employment and Wage Estimates to assert that the wages of real estate agents, as well as brokers, exceeds the Primary Monthly Benefit $60,000.00. Dkt. #24 at p. 3, 18 19, 23, 24. However, in making this argument, Principal is looking at the "mean" rather than the "median" wage. Dkt. #24 at p. 9 & 19 (highlighted text). This is important as the two wages (median versus mean) are quite different.

The May 2016 report which Principal cites, contains a median hourly wage of $21.23 for Seattle area agents and a mean average wage of $60,570.00. Assuming a 40 hour work week, and 52 work weeks per year, the median hourly wage converts to an annual median wage of $44,158.40. There is a $16,411.60 difference between the mean and median wages.

---

[3] http://www.wmfha.org/?page=Emerald_2015_Winners (last visited July 10, 2017) and http://www.wmfha.org/?page=Emerald_2016_Winners (last visited July 10, 2017).

[4] http://content.mediastg.net/media/companyset/jls/jls_images/awards/CombinedAwards.pdf (last visited July 10, 2017).

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL 503-206-4313
FAX 855-344-1726
www.roylawpdx.com

The US Department of Labor's Occupational Employment Statistics (OES) program generates wage estimates by occupation. These estimates are either estimates of mean wages or percentiles, such as the median wage.

- A **mean wage** is an average wage. An occupational mean wage estimate is calculated by summing the wages of all the employees in a given occupation and then dividing the total wages by the number of employees.

- A **percentile wage** is a boundary. For example, an occupational median wage (50th percentile) estimate is the boundary between the highest paid 50 percent and the lowest paid 50 percent of workers in that occupation. Half of the workers in a given occupation earn more than the median wage, and half the workers earn less than the median wage. For more information, see the page on percentiles.

https://www.bls.gov/oes/oes_ques.htm (last visited July 10, 2017).


As noted by the Social Security Administration:

An average is just one measure of central tendency for any set of data. Another measure is a median. For our wage data, the median wage (or net compensation) is the wage "in the middle." That is, half of the workers earned below this level. The table below shows that the median wage is substantially less than the average wage. The reason for the difference is that the distribution of workers by wage level is highly skewed.

https://www.ssa.gov/oact/cola/central.html (last visited July 10, 2017)

The practical difference between mean and median, with numerical examples, is at http://www.payscale.com/compensation today/2011/11/mean vs median (last visited July 10, 2017). This site provides a real world demonstration of how a high income earner can skew the mean wage, and as real estate agents are paid by commission, the existence of high income producers makes use of the "mean" wage unreliable.

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL  503-206-4313
FAX 855-344-1726
www.roylawpdx.com

In its correspondence to Paulson, commencing with its May 7, 2015 benefit termination letter (Dkt. #21 at p. 1711 1717), and December 16, 2015 letter denying Paulson's mandatory appeal (Dkt. #21 at p. 383 390), Principal utilized "median" wage data, then switched to using "mean" wage data in the denial of Paulson's voluntary appeal. Dkt. #21 at 225 232. By switching to "mean" wage, which is higher than median wage, in its final dialogue, Principal failed to engage in a meaningful dialogue with Paulson by changing the specific reasons for its denial. *Mitchell v. CB Richard Ellis Long Term Disability Plan*, Nos. 08 55277, 08 55686, 2010 U.S. App. LEXIS 27786, at *14 16 n.2 (9th Cir. July 26, 2010):

> The purpose of ERISA's requirement that plan administrators provide claimants with the specific reasons for denial is undermined "where plan administrators have available sufficient information to assert a basis for denial of benefits, but choose to hold that basis in reserve rather than communicate it to the beneficiary." *Glista v. UNUM Life Ins. Co. of Am.*, 378 F.3d 113, 129 (1st Cir. 2004) (citing *Juliano v. Health Maint. Org. of New Jersey, Inc.*, 221 F.3d 279, 288 (2d. Cir. 2000); *see* 29 U.S.C. § 1133, 29 C.F. R. §§ 2560.503 1(g), 2560.503 1(j). These provisions " 'afford the beneficiary an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial.'" *Glista*, 378 F.3d at 129 (quoting *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992)). Requiring that plan administrators provide a participant with specific reasons for denial "enable[s] the claimant to prepare adequately for any further administrative review, as well as appeal to the federal courts." *Halpin*, 962 F.2d at 689. "[A] contrary rule would allow claimants, who are entitled to sue once a claim had been 'deemed denied,' to be 'sandbagged' by a rationale the plan administrator adduces only after the suit has commenced." *Jebian v. Hewlett*

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL 503-206-4313
FAX 855-344-1726
www.roylawpdx.com

*Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1104 (9th Cir. 2003) (citing *Marolt v. Alliant Techsystems, Inc.*, 146 F.3d 617, 620 (8th Cir. 1998)). See also, *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 974 (9th Cir. 2006):

> When an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures. "[S]ection 1133 requires an administrator to provide review of the specific ground for an adverse benefits decision." *Robinson*, 443 F.3d at 393. By requiring that an administrator notify a claimant of the reasons for the administrator's decisions, the statute suggests that the specific reasons provided must be reviewed at the administrative level. *Id.* Moreover, a review of the reasons provided by the administrator allows for a full and fair review of the denial decision, also required under ERISA. *Id.* Accordingly, an administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review, contravenes the purpose of ERISA. This procedural violation must be weighed by the district court in deciding whether Alta abused its discretion.

Prior to the denial of his voluntary appeal, the entire focus had been on whether Paulson was a broker or agent, and the three other occupations suggested by Principal First Line Supervisor of Transportation and Material Moving Machine and Vehicle Operator; Transportation, Storage, and Distribution Manager; and Property, Real Estate, and Community Association Manager.

Not only was Principal's switch in the last instant from median to mean wage data an error, but its initial use of median wage data was clearly erroneous as it was based on the unsupported assumption that Paulson had the ability to earn more than

Paulson v. Principal
Case No. 3:16-cv-05268-RJB
Plaintiff's Response Memorandum
Page 9 of 19

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL 503-206-4313
FAX 855-344-1726
www.roylawpdx.com

50% of the workers in the listed occupations. See generally *Del. Elevator, Inc. v. Williams*, No. 5596 VCL, 2011 Del. Ch. LEXIS 47, at *26 (Ch. Mar. 16, 2011); and, *Lavoie v. Betz Laboratories Inc.*, 2002 DNH 130; 29 Emp. Bene. Cas. (BNA)(1178); 2002 U.S. Dist. LEXIS * 13083 (D.N.H. 2002)(court rejects carrier's attempt to use median wage as there was no evidence to show he had the ability to earn "as much or more than what half of" those employed in the identified occupation). As Paulson discussed these cases in his opening brief, Dkt. #23 at 19 20, he will not repeat the argument here.

The idea that the use of median wage data was erroneous is also supported by the Seventh Circuit case of *Donna Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357 (7th Cir. 2017) cited by Principal. In *Geiger*, plaintiff argued that use of median wage data was incorrect as they would be receiving a starting wage. In rejecting this argument, the Seventh Circuit all but conceded that plaintiff would not start at the median wage, but would in theory **eventually** get there due to annual wage increases. *Id.*, at 363.

While the assumption that an employee will eventually reach the median wage is unsupported in the opinion, and contrary to basic logic as all other members of the workforce will presumably also be receiving annual wage increases, and to say that one earns the median wage means the employee earns more than one half of the work force (i.e. the employee has been promoted over others), this reasoning is not in keeping with the Policy in this case, and out of step with the facts of this case.

Paulson will turn 59 shortly after this memorandum is submitted. The remaining years he has left in the workforce are limited and are what the Seventh Circuit's "eventually" standard must be judged.

The Policy also contains a reasonableness standard and an individuality component.

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL 503-206-4313
FAX 855-344-1726
www.roylawpdx.com

Disability; Disabled

A Member will be considered Disabled if, solely and directly because of sickness, injury, or pregnancy:

. . .

After completing the Elimination Period and the Own Occupation Period, one of the following applies:

a.      The Member cannot perform the majority of the Substantial and Material Duties of any Gainful Occupation for which he or she is or may reasonably become qualified based on education, training, or experience.

. . . .

Dkt. #21 at p. 1715.

Gainful Occupation

Employment in which **the Member could reasonably** be expected to earn an amount equal to or greater than the Primary Monthly Benefit.

Dkt. #21 at p. 1715. (Emphasis Added)

The question then is, is it reasonable to conclude that Paulson, soon to be 59 years old, who to date has not generated significant amounts from his real estate practice[5], be in the workforce for a sufficient number of years such that he will eventually be able to outperform fully one half of the other real estate agents in the market, and if so, is the period of time that it will take him to get there reasonable?

**3.    Sleight of Hand.**

Commencing at page 8 of its opening brief, Principal asserts that its initial termination of benefits was based on a reasoned and deliberate process. Dkt. #24 at p. 8. As part of this process, Principal asserts that "Vocational Rehabilitation Specialist Sheila

---

[5] Dkt. #21 at p. 789-1172.

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL  503-206-4313
FAX 855-344-1726
www.roylawpdx.com

Thompson was consulted as part of a vocational consult on Plaintiff's claim and Ms. Thompson provided the opinion based on her experience and research that the median salary for a real estate agent was $65,290.00." Dkt. #24 at p. 8. This description fails to properly portray the facts.

Ms. Thompson concluded that the median wage of real estate agents is $65,290.00. Dkt. #21 at p. 199. This conclusion was used to justify Principal's decision to terminate benefits (Dkt. #21 at p. 1686 1687, 1711 1717) and was the reason communicated to Paulson as the grounds for termination. Dkt. #21 at p. 1713. When asked to clarify its May 7, 2015 termination letter (Dkt. #21 at p. 1711 1717), as the only reference in the claims file to the noted vocational evaluation referenced in the May 7, 2015 termination letter were two notes, one documenting an internal meeting and the other documenting the basis of the termination decision. Dkt. #21 at p. 199, 1655 1656, 1686 1687.

After receiving Paulson request for clarification (Dkt. #21 at p. 1655 1656), Principal admitted that it could not confirm the $65,290.00 median wage figure, so it obtained a Labor Market Survey[6] which found that the wage range of Seattle area real estate agents is $40,000 $100,000,[7] and that the median range was about $50,000, which is below the Primary Monthly Benefit. Dkt. #21 at p. 1645 1648, 1630 1631. To continue to justify its decision to terminate, Principal switched reasons    termination was no longer based on the median wage of real estate agents, rather it was now based on the occupation of broker, and not agent. Dkt. #21 at 1630 1631. From the start, Principal's

---

[6] At page 24 of its opening memo, Principal criticizes Paulson's expert for using a median wage of $37,835 for Seattle area agents, but this figure is comparable to the amount suggested by sources cited to by Adling & Associates, the firm retained by Principal to prepare a Labor Market Survey. Dkt. #21 at 1644.

[7] This wide pay range, with the median wage being at the low end of the range is further support for the conclusion that use of a mean wage is improper as it would generate an unreasonably "high" wage.

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL 503-206-4313
FAX 855-344-1726
www.roylawpdx.com

decision was not the result of a deliberate and reasoned process, and it changed grounds for denial. Each of these is an abuse of discretion. See *Montour v. Hartford Life & Accident Ins. Co.*,588 F.3d 623, 635 (9th Cir. 2009); *Williams v. Metro. Life Ins. Co.*, No. C10 751 RBL, 2014 U.S. Dist. LEXIS 62135, at *10 (W.D. Wash. May 5, 2014)(decision is ". . . an abuse of discretion if it is not the product of a deliberate, principled reasoning process."); *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 968 (9th Cir. 2006); *Mitchell v. CB Richard Ellis Long Term Disability Plan*, 611 F.3d 1192, 1199 n.2 (9th Cir. 2010).

**4.     Sandbagging**

    **A.     How much might you eventually earn?**

Starting at page 22 and continuing through page 24 of its opening memo (Dkt. #24 at p. 22 24), Principal, citing to *Donna Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357 (7th Cir. 2017), argues for the first time that the test for determining Gainful Occupation and Disability under the Policy is not the current median wage, but what wage Paulson "could reasonably be expected to earn." Principal never asserted this argument in the administrative appeal, rather, as noted, it was raised for the first time in litigation. This meets the classic definition of sandbagging forbidden by the courts. *Mitchell v. CB Richard Ellis Long Term Disability Plan*, 611 F.3d 1192, 1199 n.2 (9th Cir. 2010); See also, *Dubaich v. Conn. Gen. Life Ins. Co.*, No. CV 11 10570 DMG (AJWx), 2013 U.S. Dist. LEXIS 108446, at *22 (C.D. Cal. July 31, 2013)("A defendant in an ERISA case may not assert new grounds for denial once litigation in federal court has begun.") The appropriate remedy is to deem Principal to have waived the right to rely on this new argument. *Harlick v. Blue Shield of California*, 686 F.3d 699, 719 (9th Cir. 2012) ("A plan administrator may not fail to give a reason for a benefits denial during the administrative process and then raise that reason for the first time when the denial is challenged in federal court, unless the plan beneficiary has waived any objection to the reason being advanced for the first time during the judicial proceeding").

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL 503-206-4313
FAX 855-344-1726
www.roylawpdx.com

Addressing the argument, the median wage information of record for real estate agents shows that the wage is below the Primary Monthly Benefit. Dkt. #21 at p. 317 323, 1642 1648. While the median wage for brokers exceeds the Primary Monthly Benefit, there was never an assertion at the administrative level that Paulson was capable of becoming a broker. As to the three other occupations suggested by Principal, Paulson submitted evidence why these were not gainful occupations.

**B.      Could Paulson become a Managing Broker?**

At page 24 of its opening memo (Dkt. #24 at p. 24) Principal asserts "There is no reason that Plaintiff would not be able to obtain his Managing Broker License and become reasonably qualified based on his education, training or experience, for the occupation of Managing Broker." This is the same as saying there is no reason why Paulson cannot become Governor. He meets the constitutional requirements. This argument is based on idle and unsupported conclusions. *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 877 (9th Cir. 2004). It is also another effort by Principal to sandbag Paulson as it never raised this argument at the administrative level this is the first time that Principal asserted Paulson could become a Managing Broker. If Principal had made this argument below, Paulson could have addressed it on the record. Paulson would have also been able to submit Open Government Act Requests on the Washington Department of Licensing to obtain historical passage rates to establish that it is not as easy as Principal asserts to become a Managing Broker and that the examination has a high failure rate.

As noted in *Feggins v. Reliance Std. Life Ins. Co.*, No. 11 cv  073 wmc, 2013 U.S. Dist. LEXIS 127113, at *3 4 (W.D. Wis. Sep. 5, 2013), suggesting a new occupation amounts to arguing a new reason to deny a claim.

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL  503-206-4313
FAX 855-344-1726
www.roylawpdx.com

## C.     Evidence of Disability

The record shows that Paulson suffered an industrial accident, which left him with permanent restrictions and limitations. Dkt. #21 at p. 1884 1885. These restrictions left rendered him disabled from his own occupation. Dkt. #21 at 1711.

The Policy does not require total disability in a medical sense, rather, it contemplates disability in an economic sense. *Haughton Elevator Co. v. Lewis*, 572 F.2d 447, 450 (4th Cir. 1978)(Winter, Concurring). This is captured in the Plan when it says that an insured is disabled when they "cannot perform the majority of the Substantial and Material Duties of any Gainful Occupation for which he or she is or may reasonably become qualified based on education, training, or experience" and defines "Gainful Occupation" as "Employment in which the Member could reasonably be expected to earn an amount equal to or greater than the Primary Monthly Benefit [$60,000.00 per year]."

Principal never disputed Paulson's permanent restrictions and limitations. The decision to terminate benefits was based on Principal's conclusion that Paulson could earn at least $60,000.00, first as a real estate agent, then as the appeal progressed, as a broker, then as a broker or in one of three other occupations. Now, Principal is arguing, for the first time, in litigation, that Paulson has to prove that he is unable to earn $60,000.00 in each and every occupation in the DOT.

The first edition of the DOT was published in 1939 and contained approximately 17,500 concise definitions presented alphabetically, by title.[8] The 1991 DOT contains 12,741 unique Occupational Codes and definitions.[9] As noted by the court in *Feggins v.*

---

[8] https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTINTRO.HTM (last visited July 11, 2017).

[9] http://www.skilltran.com/index.php/support area/documentation/225 skilltran alternate titles for occupations how and why we do it (last visited July 11, 2017).

Paulson v. Principal
Case No. 3:16-cv-05268-RJB
Plaintiff's Response Memorandum
Page 15 of 19

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL 503-206-4313
FAX 855-344-1726
www.roylawpdx.com

*Reliance Std. Life Ins. Co.*, No. 11 cv 073 wmc, 2013 U.S. Dist. LEXIS 127113, at *15 (W.D. Wis. Sep. 5, 2013):

> [T]the administrator carries the burden of articulating why it believes an applicant is capable (both physically and by dint of education and training) of performing a given occupation, even when the plan requires that the claimant prove she is incapable of performing "any occupation." If it were otherwise, the Plan would be taking the untenable position that it is plaintiff's burden to submit (at the outset) proof as to why she cannot perform each and every one of the hundreds of jobs listed in the Dictionary of Occupational Titles. Common sense dictates that the "any occupation" requirement means only that: (1) the administrator is allowed to suggest any occupation of his choosing as grounds for denying a benefits claim; and (2) the claimant has the burden to show why she cannot do that job. Once the claimant has had her say, the administrator must still offer a rational explanation as to why it believes the claimant is capable of performing the job.

Paulson would also note that while Principal cites to many cases holding that Plaintiff bears the burden, those cases directly on point are generally distinguishable in that they dealt with policies where the claimant had to show that they could not perform "any occupation"   *Seleine v. Fluor Corp. Long Term Disability Plan*, 598 F.Supp.2d 1090, 1099 (C.D. Cal. 2009); *Brigham v. Sun Life of Can.*, 317 F.3d 73, 86 (1st Cir. 2003); *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1309 (5th Cir. 1994); in contrast to the Paulson's Policy which contains an economic element. Further, none of the cited cases confronted the issues head on as did *Feggins*.

Because Principal did not make this argument at the administrative level, if the court is inclined to allow this argument, then either the record should be open, so Paulson may present evidence, including testimony, or the case should be remanded.

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL. 503-206-4313
FAX 855-344-1726
www.roylawpdx.com

**5.      Strategic Consulting Services' Vocational Assessment**

Principal asserts that Strategic Consulting Services' Vocational Assessment (VA) is flawed for multiple reasons, with the primary one being its use of 2014 wage data. As this was discussed above, Paulson will not go into detail on why the figures used by Strategic Consulting Services (SCS) in the VA were proper.

While most of Principal's arguments go to weight, which Paulson sees no need to address as the report speaks for itself, he will address Principal's assertion, starting at page 24 of Principal's opening brief (Dkt. #24 at p. 24), that the VA contains unsupported conclusions on why SCS believes Paulson is not qualified for the occupations of: First Line Supervisor of Transportation and Material Moving Machine and Vehicle Operator; Transportation, Storage, and Distribution Manager; and Property, Real Estate, and Community Association Manager.

Using just one position by way of example to refute Principals assertion   First Line Supervisor of Transportation and Material Moving Machine and Vehicle Operator; the VA lists the tasks of the position as described in O*Net, highlighting several tasks, then notes Paulson's permanent restrictions and limitations, and why those restrictions and limitations prevent him from performing the occupation. Dkt. #21 at p. 321 322. She then repeats the process for the other two occupations    cites to O*Net, compares the requirements of the occupation to Paulson's background, then explains the basis for her determination that he is not qualified. Dkt. #24 p. 322 323. Principal's assertion that "Ms. Kemerer's report is also flawed in that she reaches the wholesale conclusion that the alternative occupation of First Line Supervisor of Transportation and Material Moving Machine and Vehicle Operator is outside of Plaintiff's capabilities but does not explain why" is simply wrong. Dkt. #24 at p. 24.

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL 503-206-4313
FAX 855-344-1726
www.roylawpdx.com

**6.    Conclusion**

Principal failed to engage in a reasoned and deliberate process, when it terminated benefits, and since that decision, has changed the grounds for denial, and is now asserting new grounds.

Paulson's motion should be granted, and benefits reinstated, with an award of fees and costs.

DATED this 14th day of July 2017.

/s/ Chris Roy
Chris Roy, WSB # 29070
Roy Law
1000 Broadway, Ste. 1740
Portland, OR 97205
PH: 503 206 4313
FAX: 855 344 1726
chris@roylawpdx.com

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL 503-206-4313
FAX 855-344-1726
www.roylawpdx.com

## **CERTIFICATE OF SERVICE**

I certify that on July 14, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the attorneys/parties of record.

DATED this 14th day of July 2017.

/s/ Chris Roy
Chris Roy, WSB # 29070
Roy Law
1000 SW Broadway, Suite 1740
Portland, OR 97205
PH: 503 206 4313
FAX:855 344 1726
chris@roylawpdx.com

**ROY LAW**
1000 SW Broadway, #1740
Portland, OR 97205
TEL 503-206-4313
FAX 855-344-1726
www.roylawpdx.com